**Zelda L. PANZIRER, Plaintiff-Appellant,**

v.

**Emanuel L. WOLF, Jay N. Feldman, C. Ray Holloway, William V. Lurie, Carl Prager, Julio Proietto, Jack M. Sattinger and Price Waterhouse & Co., Defendants-Appellees.**

No. 10, Docket 80–7827.

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1981.

Decided Oct. 28, 1981.

Rehearing and Rehearing En Banc Denied Jan. 28, 1982.

Daniel W. Krasner, New York City (Wolf, Haldenstein, Adler, Freeman & Herz, Fred Taylor Isquith, New York City, of counsel), for plaintiff-appellant.

Bartlett H. McGuire, New York City (Davis, Polk & Wardwell, Ogden N. Lewis, Jamie Stern, Susan P. Johnston, New York City, of counsel), for defendant-appellee Price Waterhouse & Co.

Jacobs, Persinger & Parker, New York City (Irving Parker, Joseph N. Salomon, William H. Lasher, III, New York City, of counsel), for defendants-appellees Wolf, Feldman, Lurie, Prager, Proietto and Sattinger.

Gordon, Hurwitz, Butowsky, Baker, Weitzen, Shalov & Needell, New York City, for defendant-appellee Holloway.

Before LUMBARD and KAUFMAN, Circuit Judges, and PIERCE,* District Judge.

* Honorable Lawrence W. Pierce, United States District Judge for the Southern District of New York, sitting by designation.

LUMBARD, Circuit Judge:

Allied Artists Industries, Inc., issued an allegedly false annual report in August 1978. Zelda Panzirer purchased Allied stock thereafter upon reading an article in The Wall Street Journal. She never saw the annual report. When Allied started bankruptcy proceedings in 1979, she sued Allied officers and Price Waterhouse & Co., Allied's accountants, under § 10(b) and Rule 10b–5 of the Exchange Act, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5. She also sought to represent the class of investors purchasing Allied stock after release of the annual report. The district court, per Motley, J., dismissed Zelda Panzirer's suit on summary judgment and denied class certification on the ground that she had failed to show that reliance on the annual report caused her loss. We reverse in part and affirm in part. Plaintiff relied on an article in The Wall Street Journal which she claims would have presented the company in a less favorable light had the annual report been accurate. She has stated a causal connection between her loss and the annual report which, on this record, cannot be dismissed on summary judgment. We affirm, however, the denial of class certification as being within the discretion of the district court.

On this appeal from summary judgment, the allegations of the complaint, as supplemented by plaintiff's deposition and numerous affidavits submitted by all parties, describe the story of Zelda Panzirer's losing investment in Allied common stock. She read about Allied in The Wall Street Journal while driving up to Vermont on September 29, 1978. The "Heard on the Street" column in that day's Journal covered the video cassette market, and devoted two paragraphs to Allied:

> Several analysts contend that Allied Artists is in a good position to take advantage of the growing demand for video tapes, having pioneered the development of pre-recorded cassettes.
>
> Andrew G. Racz of Philips, Appel & Walden, Inc. says Allied Artists, besides having a head start in video tapes and cassettes, is negotiating with TV networks, other film producers and makers of educational films to put their films on video cassettes. "The educational and informational area constitutes a tremendous market for video cassettes," says Mr. Racz, adding: "We continue to be bullish on Allied Artists. It's an attractive turn-around situation."

Zelda Panzirer had been a substitute school teacher. The item on the educational use of video cassettes caught her eye. She checked the price of Allied common stock, which was listed on the American Stock Exchange and had traded at between $5 and $6⅛ on September 28. Her husband Leo Panzirer stopped the car. Zelda Panzirer called her broker, Michael Blum, at E. F. Hutton's office in Hackensack, N.J. She asked if there was any negative news about Allied. Blum said that neither he nor E. F. Hutton followed the company, but after several minutes delay and a glance at Standard & Poor's tear sheet on Allied, said there was no negative news. Zelda Panzirer ordered 200 shares of Allied common stock. Later on her trip, after discussing the purchase with her husband, she phoned Blum a second time to raise her order to 500 shares. E. F. Hutton purchased the shares for Zelda Panzirer at a September 29 market price of $7 per share.

The Standard & Poor's tear sheet abstracted information from Allied's annual report for the fiscal year ending March 31, 1978. The report was issued on August 18, 1978, and allegedly contained numerous misrepresentations and omissions. The principal misrepresentation was the report of profits for that year based in part on receipts from Allied's film, "The Betsy." In fact, Allied had to split those receipts with the film's overseas distributor, United Artists, and thus lost money in 1978. The principal omission was the annual report's failure to include a qualification by Allied's accountants stating their doubts as to Allied's ability to function as a going concern.[1]

---

1. Plaintiff's amended complaint alleges that Price Waterhouse originally included in its certification of Allied's statements a qualification as to Allied's ability to function as a going

Allied common stock closed at $2⅞ per share the day the annual report was issued. It peaked at $7⅜ per share on October 2, 1978,[2] and declined thereafter. Allied filed a Chapter XI petition in bankruptcy on April 4, 1979.

Zelda Panzirer never saw the annual report. In her complaint, she alleges that she relied on the "integrity of the market." She asserts that the annual report affected the market, and therefore she had relied on the report through her reliance on the integrity of the market. Judge Motley, however, found that plaintiff "primarily" relied on The Wall Street Journal column about Allied's prospects in the video cassette market and that plaintiff placed only secondary reliance on the integrity of the market. She held that secondary reliance was insufficient to support a 10b–5 claim. We cannot agree. We find no support in the law for the district court's distinction between primary and secondary reliance.

The function of requiring the plaintiff to show reliance in a 10b–5 action is to permit only those injured by fraud to sue. If plaintiff can link her injury to defendant's fraud by showing the fraud was a "substantial" or "significant contributing cause," plaintiff has shown sufficient reliance to support her 10b–5 claim. *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir. 1981). Plaintiff has on this record stated a sufficient connection between her loss and the allegedly fraudulent annual report to withstand a motion for summary judgment.

 As we read the record, Zelda Panzirer's purchase of the Allied stock was caused by her perusal of The Wall Street Journal column. Her knowledge of the price of the stock and her conversation with her broker were merely neutral factors as they presented no impediment to her acting on the favorable notice in The Wall Street Journal.[3] Consequently, the plaintiff argues that if Allied's report had been accurate, the stock analysts interviewed by the Journal would not have mentioned the company favorably, the Journal would not have devoted two paragraphs to Allied's prospects in the video cassette market, and plaintiff would not have been led by the article to buy her stock. Defendants have introduced no evidence to contradict this chain of causation. Though, at trial, the validity of the chain of causation will be tested, on summary judgment questions about this chain of causation must be resolved in favor of plaintiff, who in the case of a material fraud on the market enjoys a presumption of reliance. Where the plaintiff acts upon information from those working in or reporting on the securities markets, and where that information is circulated after a material misrepresentation or omission, plaintiff has stated a sufficient claim of reliance on the misrepresentation or omission.

Our holding is supported by *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1976). In that case, investment manager Akiyoshi Yamada mishandled a Competitive Associates' investment fund. Yamada had previously mishandled another investment fund, but his earlier mistakes had been hid-

---

concern. The complaint alleges that the qualification was removed from the certification before the annual report was published.

2. The annual report was not mailed to Allied shareholders until Friday, September 8, on which date Allied common stock closed at $3⅛. Allied's entry into the video cassette market was announced on Saturday, September 9. Whether the subsequent appreciation in price was due to the annual report or to Allied's entry into the video cassette market is irrelevant to our decision, as we do not depend on Zelda Panzirer's knowledge of the market

price. Though Michael Blum stated in his affidavit that he mentioned the activity of Allied common to plaintiff, she nowhere refers to the stock's activity as a reason for her purchase.

3. Plaintiff refers to the price of Allied common stock once in her deposition: "If the price was outrageous, something very high, I wouldn't have been interested. The price was attractive." If anything, her testimony indicates that a lower price accurately reflecting Allied's true financial position might have led her to buy more stock.

den by allegedly false financial statements certified by the defendant accountants. The district court granted summary judgment to defendants on the ground that because Competitive Associates did not see the financial statements it could not prove reliance on them. We reversed, holding that Competitive Associates need not prove direct reliance, but only causation in fact. That is all Zelda Panzirer need show here. As in *Competitive Associates*, the fact that plaintiff must trace her reliance on defendant's alleged fraud through the reactions of third parties does not vitiate her claim under 10b–5.

Where, as is here alleged, the fraud consists of a failure to disclose, the difficult nature of plaintiff's claim—that if there had been disclosure, plaintiff would not have been harmed—has led the Supreme Court to hold that if the omission is material, reliance upon the omission will be presumed. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Proving reliance is necessarily difficult where the fraud has affected the market and damaged the plaintiff only through its effect on the market. Relying on *Affiliated Ute*, this and other circuits do not require direct reliance where the fraud affects the market, on the ground that an investor relies generally on the supposition that the market price is validly set and that no unsuspected fraud has affected the price. *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 554 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Blackie v. Barrack*, 524 F.2d 891, 906–07 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). As in *Affiliated Ute*, *Blackie* held that the materiality of a fraud creates a presumption of reliance through its presumed effect on the market. *See also* Note, *The Reliance Requirement in Private Actions Under SEC Rule* 10b–5, 88 Harv.L.Rev. 584, 589 (1975).

Our holding is no more than an extension of *Blackie*. Zelda Panzirer did not rely on the integrity of the market price because she did not rely on price, but she did rely on the integrity of the market in producing the information reported in The Wall Street Journal. Just as a material misrepresentation or omission is presumed to affect the price of the stock, so it should be presumed to affect the information "heard on the street" which led Zelda Panzirer to make her losing investment.

█ Merely because Zelda Panzirer's own claim survives summary judgment, however, does not make her fit to represent a class of Allied investors. Plaintiff appeals from Judge Motley's denial of class certification. Judge Motley ruled that the weakness of plaintiff's case concerning reliance made her claim atypical under Fed.R.Civ.P. 23(a)(3), and also ruled that plaintiff's lack of credibility made her an inadequate class representative under Fed.R.Civ.P. 23(a)(4). We affirm on the latter ground.[4] Plaintiff's lack of credibility is abundantly clear in the record. She gave no less than four versions of her conversation with her broker. At her deposition, she described the conversation as containing no specific information about Allied. Before signing her deposition, she changed her story to say that Michael Blum had read unspecified information to her from his Standard & Poor's tear sheet. In her affidavit explaining her changes in testimony, she alleged that he had told her that Allied had made money in 1978. After defendants introduced an affidavit from the broker that he had never looked at the financial information on Allied in the tear sheet, Zelda Panzirer introduced a final affidavit alleging that he had read financial information to her from the tear sheet. The credibility of a plaintiff may be considered by the trial judge in determining the plaintiff's adequacy as a class representative. *Kline v. Wolf*, 88 F.R.D. 696, 699–700 (S.D.N.Y.1981); C. Wright & A. Miller, Federal Practice &

4. We do not decide whether Zelda Panzirer's weak showing of reliance makes her claim atypical under Fed.R.Civ.P. 23(a)(3), as we find her numerous changes in her testimony sufficient reason to deny class certification.

Procedure § 1766 at 632–34. Judge Motley acted well within her discretion in concluding that Zelda Panzirer's lack of credibility rendered her an inadequate class representative.

Affirmed in part, reversed in part; remanded for proceedings consistent with this opinion.